Good morning, Your Honor. My name is Terry Weiss. I represent Morgan Keegan, the appellant, and we respectfully would like to reserve three minutes for rebuttal. The arbitration award in this case should be vacated for multiple reasons. This is an unusual case where we have actual taped statements by all three arbitrators which showed evident partiality. I'm sure glad they don't tape our conferences. And, Your Honor, I'm sure that the arbitrators wish that they had turned off the tape as well, because in this case, their predisposition of the case, the key issues in the case, were uncovered before, in fact, and revealed as a fact before we put on the first scintilla of evidence. And we have one arbitrator who is saying that he is angry at Morgan Keegan, who has concluded that the securities sold by Morgan Keegan were crap, that Morgan Keegan had created a sucker play, and we have another arbitrator That may be true. There might have been crap, and it might have been a sucker play. But, Your Honor, you're absolutely right. It might have been. But the arbitrators were discussing it, all three of them, before, and drawing these conclusions, before we were able to put on our very first witness. And had they drawn those conclusions at the conclusion of all the testimony and all the evidence, then I wouldn't be here with respect to that argument. But the fact of the matter is, Your Honor, that they drew those conclusions before we had an opportunity to put on one scintilla of evidence. And it goes on. Because we had another arbitrator who one-upped the one who said he thought it was a sucker play and said he thought it was a greedy play. And it goes on to say that he thinks, again, before we have a chance to even defend these allegations we don't even know of, that we designed these securities so they could not be easily understood. And they go on to conclude, both of them, that someone has to take responsibility for this. And the final arbitrator said, yeah, it was all okay until the music stopped. All three arbitrators had this discussion before we put on the first piece of evidence. And that's an important point, Your Honor, because the lower court, in rejecting this argument, seemed to suggest it was just one arbitrator who threw out a few sentences during an impromptu break. In fact, it was all three arbitrators, and it was a break that was called for by the chairman, who specifically said, do you want to discuss the case? That is what the entire case was about, was about these securities that they had concluded were crap. And all we want, Your Honor, is an opportunity to retry the case before an arbitration panel that isn't biased, that doesn't have evident partiality, and one that is free from a reasonable impression of possible bias. And that, of course, Your Honor, is the standard that applies in overturning an arbitration award for vacator under the statute. Now, with respect to the prejudgment of the issues, that is as plain as due process. The lower court seemed to say, well, gee, you know, you've got notice and an opportunity to put on evidence. You called witnesses and so forth, and that should be enough. The problem with that, Your Honor, is that we were providing evidence to a panel that had already made up its mind. Had we known that it was predisposed in one way or the other, we would have likely changed our strategy. We would have put on different evidence. We might have changed. Have you ever argued in front of the California Supreme Court? Not yet, Your Honor. I've got the California Court of Appeals upcoming in the next couple of months. Okay. Well, when the California Supreme Court hears an argument, they already have an opinion that a majority of the justices have agreed upon. That's the – they don't schedule argument until then. Absolutely, Your Honor. In other words, the California Supreme Court has not merely had some discussion informally as to how the case ought to come out. By the time they schedule argument, there is an opinion that has been agreed upon by at least four of those seven. It's possible that they will change their mind after argument, but there is a written opinion. And that is, Your Honor, after all of the briefing has been completed. And that's what makes this case different, because Morgan Keegan didn't have an opportunity to put on its evidence. And the other distinction that's important is – What materials were before these arbitrators, before you commenced the hearing? The only thing that was before the arbitrator were the statement of claim, an answer, and two pre-hearing briefs. That was it. None of the testimonial evidence, et cetera. None of the documentary evidence. So the claimant had an opportunity to put on his case and put on his expert witness. And before we had an opportunity even to cross-examine that expert witness, they declared that expert witness to be absolutely – everything he said to be absolutely factual, as well as everything that their other witnesses had said. Before we had an opportunity to put on our expert witness who, indeed, would have refuted the very underpinnings of what they had already concluded. So they had already drawn the very conclusions. And again, going back to the California Supreme Court issue, the second distinction there is everybody who practices before the California Supreme Court knows that that is what the way it is done. In this proceeding, the rules are, and that everyone buys into, are the thinner rules. And that is that the arbitrators do not make up their minds and shouldn't deliberate the issues until all of the evidence is in. And that's what was missing here. It's fine to have the discussion after the evidence is in, and they should, and after the briefing has been done. But in this case, it was all beforehand. So from a due process perspective, Your Honors, you come out the same way, and that is that the award should be overturned. Because although we had an opportunity to present documents, we didn't know that the arbitrators had already made up their minds. We were presenting documents and evidence to an arbitration panel that was absolutely deaf to all of our arguments before we even walked in the door or before we even uttered our first word. Indeed. You know, I've been at this business for a while now. Judge Pragerson's been at it for a couple more years than I have, and I know that Judge Bennett's been at this for a while. I'll speak only for myself. I have, quote, made up my mind on cases, and then, and even talked about the case, giving my opinion on it. And then I hear some more evidence or some more argument. I change my mind. It happens. The difference, Your Honor, in that situation is twofold. Number one, as I believe you just described it, it was before you shared your views with the other two judges. No, no, that's not how I described it. Okay, fine. Then, but the other distinction is, I presume, is that the discussion that takes place is not, I'm angry, these securities are crap, this was a soccer player. Well, it would be really nice if judges never got angry at the evidence they hear. I do sometimes get angry at the evidence I hear. But, Your Honor, in this case, we, these arbitrators were retained as neutral arbitrators. They were supposed to be neutral until all of the evidence came in. They were, this is what's kind of interesting, but this arbitration agreement, how'd that come about? The arbitration agreement is an agreement that is contained in the party's customer agreement. It is. The customer agreement. Correct. Okay. So the securities industry likes arbitration, right? As does the SEC, as does the United States Supreme Court. Well, I don't know what the SEC likes or doesn't like. But sometimes they don't like to try cases either. So, but you've got the arbitration agreement. That's something the industry wants. And that's something that the investor, when he signs up, I guess, agrees to, right? Correct. So doesn't that work to the advantage of the industry? No, Your Honor, and that's the reason why I mentioned the SEC. But it does, it does deprive the investor of the right to go to court. But it gives the investors other rights in arbitration that he wouldn't necessarily have in court. Yeah, but the investor, when it comes to arbitration, is at a disadvantage. Your Honor, I respectfully disagree. You take someone out there that feels like they've been cheated by their financial advisor. They don't have the ability to take them on. They're forced to arbitrate. And who pays the expenses? The arbitrators decide who pays the expenses. Who pays the initial expenses? It could go either way, Your Honor. The arbitrators decide. So if the claimant may pay the filing fee, for example, the arbitrators often do order the brokerage firm to repay that. Why not let these cases go to court? Well, Your Honor. Where you get a different form. Because we have decisions from the United States Supreme Court that say that these arbitration provisions are enforceable. And the reason why I mentioned the SEC. Well, I'm not arguing that they're not enforceable. I'm just, you want something that's the equivalent. I'm just sort of talking here. You want something that's the equivalent of court proceedings. And yet you want arbitration. Well. And I'm not so sure that arbitration works to the advantage of the customer. That's all. Well, Your Honor. I mean, it's something the industry wants. Indeed. It's not anything that the investor wants. Well, actually, Your Honor, many investors' lawyers who do nothing but representing investors, such as the investors' council in this case, might disagree. That may be true if you're a big investor. If you're a little investor, I don't think that's true. Well, Horace Grant in this case is a big investor. Yeah. And he invested millions and millions of dollars. Yeah. Okay. So he's not the little guy. He's the big guy with advisers and so forth. I know, but I'm saying what happens to the little guy. Right. But the big guy in this case brought the arbitration against Morgan Keegan. He lost $340,000. The arbitrators awarded him $1.4 million. And this was an arbitration panel that, again, Your Honor, we have arbitration and we agreed arbitration. We agreed to neutral arbitrators. And those are arbitrators who abide by FINRA rules and who abide by the law. And the law and FINRA rules dictate. Who picked these arbitrators? Both parties picked the arbitrators. Well, didn't they know who these people were? Of course. Didn't they go into their backgrounds? Only to a they give you the arbitrators give you disclosure reports on them. But what they don't what happened in this case was one of the arbitrators did not disclose the fact that he was out soliciting investors, excuse me, soliciting to sue over these very type of investments. And that wasn't discovered until after the fact. Under the law it's Was that all in the Internet? Not until after the fact. It wasn't discoverable until after the fact. And, Your Honor, the law is that it is the arbitrator's burden to disclose. I'm just trying to find out how it works. Yeah. How it works is the arbitrators, they give you a list. You pick from the list based on limited information. And, Your Honor, the key there There's nothing to stop you from You're not telling me that you just rely on that limited information. No. You absolutely can. But this information, these two pieces of information were not available at the time as demonstrated in the record. Number one is the fact that these arbitrators, before we got a chance to put on the case, were already predisposed against us. And were not being neutral arbitrators as they were retained to do, as they committed to being. Second is the fact that the industry arbitrator was already in the process of putting out a website that was to solicit over these very investments. Those are key facts. When you say he was already in the process, do you know when he started putting the website together? The only thing we know, Your Honor, is by February of 2010 the website was up. So when you say already in the process, you really don't know that he was already in the process. What we do know, Your Honor, is that in the website he represents that he has 30 years of experience in That's not my question. I'm getting to it. I'm getting to it, Your Honor. We do not know at what point in time in his mind he began to formulate the solicitation over these very investments. What we do know, Your Honor, is that in the arbitrator disclosure report that he gave us and gave to the parties, he represented that he had experience, he did not have experience in the very investments at issue, CDOs, collateralized debt obligations. In his website, he then represents, right after the award comes out, that he's got 30 years of experience. There was no way. You know, I've looked at that. I don't think the 30 years of experience says he has 30 years of experience in CDOs. It does, Your Honor, because it is contained within the CDO section of his website. That is where ---- I read it. No, we can agree to disagree on that point. Fair enough, Your Honor. Your Honor, the decision of the lower court should be reversed for the reasons set forth in our brief. The arbitrators demonstrated evident partiality as a result of the tape-recorded statements. We have evidence of that on the record, as well as the undisclosed information from Mr. Schwartz. In addition, the decision of the arbitrators was entered in manifest disregard of the law as an award was entered some three times of what the actual damages were. Thank you. Thank you. May it please the Court. Good morning, Your Honors. My name is Robert Crowe. I am from the Stoltman Law Offices in Chicago. We represent the appellee, Horace Grant, who was the victor in both of the two appeals, FINRA appeals before you today. I'd like to begin my remarks, to begin and end, actually, following up on some comments by Judge Pragerson. It is very important ---- Be careful when you follow up on my comments. I'll do my best, Your Honor. Well, I think Your Honor touched on a couple of very important points. One is, it is the industry who chose to resolve all these customer disputes by FINRA arbitration. They prepare a customer agreement that's not negotiated by someone like Mr. Grant, who may have had money by virtue of the fact that he was a professional basketball player. But he also was not a sophisticated individual by any means. And these guys come out of high school, and the way our culture is, they make a lot of money and often are misled about what happens with it. Now, the industry chooses arbitration over a judicial proceeding before three judges, such as yourself or state corporate judges, because they ---- there's a variety of benefits that they derive through the process of FINRA arbitration. You know, one is it's greatly simplified, so it's less expensive for them. Two, the federal rules of evidence or any rules of evidence for that matter do not apply, nor do the rules of civil procedure. And you have a substantial say in selecting your arbitrators. Well, I don't ---- you can't bring a class action either. No, you cannot. That's correct. You cannot bring a class action. That's a significant point. That's a big deal. Yes, it is. They also accept a number of tradeoffs when they sign up, when they choose a FINRA arbitration over an Article III or judicial proceeding. And those are significant. One is in arbitration, the arbitrators typically produce what's called an award, which is very different from a judicial decision, whereas, say, Judge Otero, for example, who is the district court judge of both these cases, produced very thorough opinions. In the first one, he produced a 27-page opinion that, you know, I personally think is extremely well done. In arbitration, you don't get to. I hope you do, too. But in arbitration, my point is you won't get that. You won't get the benefit of a reasoned decision. You get an award which simply states the result, and that's it. And part of the reason for that is because one of the main principles of arbitration and one of the attractions is finality. And it should reduce the opportunity for appeal. It's very hard for this Court to judge or second-guess a decision where you don't have a rational basis for it, but that's a part of the arbitration process. Another very important part of the arbitration process, now it's different from judicial proceeding, is it's a creature of private contract. It's completely voluntary. Judge Posner of the Seventh Circuit in his decision in Merit Insurance v. Leatherby does really a wonderful job of delineating the differences between private arbitration and a judicial proceeding. And a major part of the difference is that arbitration is subject to a very unique type of judicial review, really one which is the least demanding of anyone I've ever seen. Insofar as the only review is for was there a fundamental due process, which means was there a notice, an opportunity to be heard, and an impartial decision? The arbitrator's misapplications of law did not necessarily result in non-conformance of an award. The only result of non-conformance, if the Court finds there's a manifest disregard of the law, which means the arbitrator knew what the correct law was and willfully misapplied it, and the Court will also not reverse an arbitrator's decision, even if it disagrees with it. This Court held so in the Cacera case that we must confirm an arbitration's award, even if there are misapplications of the law and factual errors, unless the Court finds those factual errors rose to the level of being literally completely irrational. So that's the standard by which the Court approaches the case. In addition to standard review, there's another important difference, which is that the arbitrators, as Justice White said in the Commonwealth v. Codings case, an advantage of arbitration is the arbitrators are often of the market, not apart from it. They get to have a selection, say a selection of the arbitrators, and in this case in particular, Morgan Keegan chose an arbitration process whereby one of the arbitrators had a higher level of expertise. You'll see, I believe it's on page 809 of the excerpts of the record, that's where the arbitrator who's primarily in question, Arbitrator Schwartz, signs the award. And there are two classes of arbitrators. If you look at the signed award, there are two public arbitrators, and Mr. Schwartz is designated as a nonpublic arbitrator. In the parlance of people who do this practice, that means he is an industry arbitrator. He is chosen. They have chosen a process where there's an industry arbitrator who's going to have substantial experience in this area of law, as did Mr. Schwartz. And what does he disclose? That since being a trial attorney with NCC, he's practiced in securities for 30 years. That's been his entire practice. He discloses that he represents brokers and sometimes brokerage firms and sometimes customers. Now, it is incumbent upon Morgan Keegan, who's a very sophisticated firm and does a lot of these, they have an opportunity to inquire further under the rules. They want to know exactly what he does, who he represents, and what he knows about these instruments. One of the things that I think the Court knows about the financial marketplace is new financial products are proliferating all the time. There are things called basis swaps, all these derivatives, and it's simply not possible for Fenway to be state-of-the-art and require disclosure of every single financial product which is being sold on any given day. Now, when the form Arbitrator Schwartz actually filled out, it did not call for him to disclose that he had experience with CDOs. So counsel's statement that he failed to disclose it is really inaccurate. It's misleading of the Court. And as Judge Fletcher picked up, the requirement of the disclosure was changed later on in October of 2009. The award was rendered on September 11th, 2009. So the requirement to disclose experience with CDOs didn't exist at the time of the arbitration. It was their opportunity to inquire further if they wanted to, and they didn't. Now, another major feature of arbitration is that the high standards of judicial decorum and impartiality simply do not apply to arbitrators because, as I said, they're men of the market. They have other jobs. And it's made very clear in a number of this Court's decisions. In, let's see. Well, Judge Posner describes it very well in Merrion. And this Court describes it very well in the Woods case and the Smiths case. So the law is very well settled that the high standards of judicial decorum do not apply to arbitrators. In addition, the federal rules make it very clear. Let's see. I can actually quote this Court's case in Kosera, too, which is 341, Fed 3rd, 987, where the Court states, That is well settled. In all the cases the counsel cites to you regarding standards of impartiality are all from judicial cases, not from arbitrator cases. And now, there's something very important in the code of arbitration procedure, which is called the standard of impartiality. And it states two things. First of all, that it recognizes that the arbitrators are not governed by judicial standards of conduct. The arbitrators, they may ask questions. They may discuss things between the parties. It also says that because arbitrators often have specialized subject matter   about the case coming into it. They can express those views. So what the arbitrators did here is not at all inconsistent with the arbitrator code of procedure and code of conduct. There was no rule in the arbitration code of procedure that says the arbitrators cannot discuss the case amongst themselves. The arbitrators can make interim rulings, which may imply that they've to some extent made up their mind, but the co-trusts, as Judge Fletcher articulated, they will remain open to all the evidence, which is there's no evidence that they did not. And counsel's argument in that respect is purely speculation. Counsel takes this a step further and tries to transform the statement into an instance of arbitrator misconduct under Title IX of the United States Code, Section 10A3. However, all the misconduct cases that counsel cites concern an actual refusal to hear evidence. Where they actually say we're not hearing it, there's no testimony, we're not receiving this exhibit. And that wasn't true here. In fact, this alleged exchange occurred on the second or third day of the hearing when the arbitrators already had the benefit of the arbitration briefs. So it's more similar to the situation with the State Court of California in that respect. And presumably counsel made an opening statement, and presumably counsel thoroughly cross-examined Grant's witnesses. There's no allegation this cross-examination was obstructed in any way. And in that process, development themes was defense. So it was not like they sat there mute for a couple days and the arbitrators were predisposed without hearing anything from them. And if they were truly predisposed, it's likely they would have tried to curtail the additional testimony that they listened to, which was Morton Keegan's three expert witnesses. Now, to say that they were pre-judged the case requires speculation. And the only case they cite that remotely approaches that is this Reyes v. Morales case, which is very different in two important respects. That's a case from an immigration law judge. So right there, the standards of judicial decorum and absolute impartiality apply, because it's a judicial proceeding, whereas this is not. This is an arbitration. So that's one huge difference right there. Secondly, when you look at the facts of that case, that's an immigration case. And the immigrant's part of his defense is, to deport me would work real hardship on my son, who would remain here with his mother. It would separate the son from the father. And what happens is the judge winds up taking over the questioning and asking him, in this case, the child was not a child through wedlock. So the immigration judge winds up asking, well, how many other children do we have outside of wedlock? Says, I find you're doing this, your affair is to be morally bankrupt. And she goes on to say that you're asking me to not deport you because you had children through illicit affairs and not outside of wedlock. So what she does is she substitutes her moral judgment to disavow what is a defense, or at least something that should be considered under the statute. So in that case, you have a high judicial standard of decorum, a very clear violation, substituting her own morality for her legal judgment, and you have prejudice. In all the cases that involve arbitrators refusing to hear evidence, there has to be showing of prejudice. What happened in that immigration case? In the immigration case, the Court of Appeals, I believe it was the 9th Circuit, did find that the judge had violated the standards of judicial decorum and impartiality. And, again, that's not just reviewed for fundamentally process. Who was on that panel? I actually have it here. If I could look it up, I'd have a couple more minutes. No, I'm just kidding. I know. But my point is it's a very different standard. I'll tell you who was on that panel, and he's sitting right next to me.       You don't. You don't. You don't. You don't. Well, I try to do the right thing. In that case, you did, Your Honor. I think we all would agree to that. Now, regarding the alleged nondisclosures, you know, again, there are two. One is the experience with the CDOs or collateral debt obligations. There was no requirement the arbitrator disclosed those. And counsel is, you know, frankly, somewhat misleading the court, not coming out and saying this wasn't required, this is only required after the fact. In October, the award was given. In September of 2009. There's no explanation why he didn't inquire. As Judge Posner said in Merritt, if this really meant something to them, they would have done more. And the fact that they are now claiming this was so important when it inquires suggests that it's just kind of, you know, after the fact. Isn't it just as likely that they would want an arbitrator with CDO experiences to not? Yes. So where's the prejudice? That's a very good question. It's one that I cannot answer. There is none. So there's no problem there. And really, the same is true in nature of his law practice. He says I've been practicing securities for 30 years. He's the industry arbitrator. If they want to know more, they can ask. And again, he's playing with time here. He's taking whatever evidence he's got comes from a February 3rd declaration from counsel. And all he can say is as of February 3rd, this is what the arbitrator's website looked like. And then if you read Judge Guterro's opinion, which I certainly hope you have, Judge Guterro goes on there, too. And he says what he finds. And it's clear that the website is the evolving thing, that Mr. Schwartz is changing. He's adjusting as his practice adjusts. There's not a scintilla of evidence that his practice was any different than he described it at the time of the arbitration. And again, Norton Keegan had the opportunity to ask, so what is the exact breakdown? How many times do you represent firms? How many times do you represent claimants in these cases? And they sat on their hands and did nothing. They may have a right to an impartial panel, but they have an obligation to enforce that by not sitting on their hands, doing their research, doing their homework, and asking questions in a timely manner, and not coming in here and trying to deprive Mr. Grant of finality after the fact. I see the red line is on, so it looks like my time is up on this one. Your timing is good. Thank you, Your Honor. Several points, Your Honors. First of all, with respect to the standard imposed by arbitrators, and I want to follow up on a question Judge Fletcher raised, and the judge, Justice Black, in Commonwealth Codings, I think, addressed that question. He said arbitrators should be even more scrupulous to safeguard the impartiality of the process than judges, since the former have completely free reign to decide the law as well as the facts, and are not subject to appellate review. The standard for arbitrators to make disclosures and not to form these conclusions before hearing all the evidence is higher than it would be for a court of law. And furthermore, Your Honor, query whether if a jury did this, if the jurors got together midway in a court proceeding and made those same comments in a discussion, whether or not that particular judgment would be, by the jury, would be thrown out in court. Indeed, it would get thrown out in court. This one also should be thrown out, Your Honors. We request that the decision below be reversed. Thank you. Well, thank you. I'm just looking at the first page of our calendar. We're almost a national court here. We have Mr. Crow from Illinois, Mr. Weiss from Atlanta, and we have Mr. Yosef from Washington, D.C., and then we have, from the far outreaches, Mr. Agabanian from Glendale. All right. The matter is submitted.
judges: Bennett, Pregerson, Fletcher